UNITED STATES of America, Plaintiff,

v.

Samuel SANCHEZ, Defendant.

UNITED STATES of America, Plaintiff,

v.

Francisco ARMENDARIS, Defendant.

Nos. 80–3374–Civ–SMA, 81–46–Civ–SMA.

United States District Court,
S. D. Florida, Miami Division.

Aug. 26, 1981.

Atlee W. Wampler, III, U. S. Atty., S. D. Fla. by Robert Rosenberg, Sp. Asst. U. S. Atty., Miami, Fla., for plaintiff.

Raul Carreras, Jr., Miami, Fla., for defendant Sanchez.

Frank H. Alvarez, Miami, Fla., for defendant Armendaris.

## ORDER DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

ARONOVITZ, District Judge.

THESE MATTERS were heard by the Court on Plaintiff's Motions for Summary Judgment. Because both of the above-styled causes present the same issues of fact and law relevant to the Motions for Summary Judgment, a consolidated hearing was held at which time the Court received oral argument from all counsel.

Both of these cases involve the imposition of a fine of $1,000 for each undocumented alien allegedly transported from Mariel Harbor, Cuba to Key West, Florida upon vessels owned or commanded by the Defendants, in violation of 8 U.S.C. § 1323. These voyages were made as part of the so-called "Freedom Flotilla" or "Mariel Boatlift" which occurred during April through June of 1980, in which hundreds of vessels transported over 100,000 Cuban refugees to Key West, Florida. *See generally Pollgreen v. Morris*, 496 F.Supp. 1042, 1047 (S.D.Fla.1980).

Upon arrival in Key West, each Defendant was served with Immigration and Naturalization Service Form I–79, Notice of Intention to Fine. Neither Defendant filed any response to the I–79 Notice with INS, nor did they otherwise defend or participate in the administrative proceedings initiated thereon. *See* 8 C.F.R. § 280.1 *et seq.* Accordingly, the District Director of the INS determined that fines should be imposed and so notified the Defendants by mail at their last known addresses. Defendant ARMENDARIS had been charged with landing 14 aliens and a fine of $14,000 was levied; Defendant SANCHEZ was charged with landing 92 aliens and assessed a fine of $92,000. When the Defendants failed to pay the fines, these actions were brought to collect the amount of the fines, plus interest and costs.

Each Defendant filed an answer to the complaints raising various matters in defense. Both Defendants have asserted, *inter alia*, the defense of duress and coercion; ARMENDARIS in his answer, SANCHEZ at the hearing on the Government's Motion. It is the Government's position that in reviewing the District Director's decision, the Court may only examine the administrative record to determine if the decision is supported by substantial evidence therein. Because Defendants did not participate in the administrative proceedings, no matters in defense were raised and no evidence with respect thereto was made part of the rec-

ord. Therefore, the Government argues, these matters are not properly before the Court and further, Defendants are foreclosed from raising those defenses now, in the first instance.

■■■ At the outset, the Court would note that while technically these cases are civil actions, the imposition of a fine as a penalty for violation of the law can be considered "quasi-criminal" in nature. The term "quasi-criminal" is not here used to imply that the full panoply of constitutional protections attendant to a true criminal proceeding should apply in this context. *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 2640–41, 65 L.Ed.2d 742 (1980). It is well settled that Congress may provide for the imposition of a civil fine as a penalty for violation of a statute and this Court does not question that § 1323 is such an enactment. Indeed, no party has made the assertion that § 1323 should be considered as providing a criminal penalty under the standards set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). However, characterizing the sanction as civil does not alter the fact that a penalty is being imposed by the Government for violation of the law, and in these cases, a very severe penalty. The Court is hard pressed to find any other conduct which these Defendants might be accused of which could result in a fine of as much as $92,000. As such, this Court feels compelled to afford Defendants every opportunity to establish whatever defenses may exist, in law and fact, to the penalties imposed.

This view is further reinforced by the unusual factual circumstances out of which these cases arose. The Freedom Flotilla was an event unprecedented in the American experience and has, from a judicial viewpoint, confronted the justice system with a number of novel and complex questions of law and policy which do not readily lend themselves to easy answers. Many of the persons who left for Cuba intended to return with family or friends who were disenchanted with the quality of life in Cuba. This Court heard testimony adduced in *Pollgreen, supra*, at a preliminary injunction hearing, and thus takes judicial notice of the fact that upon arrival in Mariel Harbor, however, Cuban soldiers, backed up by gunboats of the Cuban Navy, required that other Cuban nationals be taken on board as well, often overcrowding the vessel. *See Pollgreen* at 1055. As to such persons, there are genuine questions as to whether or not it was possible to determine if valid documentation under applicable immigration laws had been obtained, and Cuban gunboats in fact prevented the vessels from leaving the harbor without these additional passengers. To further complicate matters, the United States Government, speaking through the office of the President, took what appeared to be conflicting positions regarding sanctioning of these activities. *Pollgreen* at 1047.

■■■ It is the opinion of this Court that duress and coercion would at least provide a basis for mitigation in these cases, even though not expressly so provided in the statute. *Pollgreen, supra* at 1055. It is a basic precept of the common law that a wrongful intent is an essential element of criminal liability, *Morissette v. U. S.*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and that if an act, otherwise unlawful, is done due to duress or coercion this element is lacking. *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). In *Furnish v. C. I. R.*, 262 F.2d 727 (9th Cir. 1959), the Court held that a wife who signed a fraudulent joint tax return under duress from her husband would not be liable for civil penalties under the tax laws, even though the fact that the wife did not participate in or even know of the husband's fraud would not provide a defense. And, even where a statutory scheme does impose liability for civil penalties regardless of the actor's intent, *see Bailey, supra* 100 S.Ct. at 631 n.4, his state of mind may still be considered in mitigation of the penalty. *Federal Election Commission v. Nat'l Ed. Ass'n.*, 457 F.Supp. 1102, 1112 (D.D.C.1978); *United States v. Barbacoff*, 416 F.Supp. 606 (D.D.C.1976).

At oral argument the Government stated that INS had developed internal guidelines which took into consideration the conditions existing at Mariel Harbor, previously described, which arguably give rise to the defense of duress or coercion.* It was the Government's contention that had these Defendants participated in the administrative proceedings they could have raised the duress defense in remission of the fine. The Government also contended that under the "due diligence" defense contained in § 1323(c), matters pertaining to duress and coercion could have been raised and would have received consideration at the administrative proceeding.

The INS internal guidelines provide that persons who left for Cuba prior to May 1, 1980, would only be assessed the $1,000 per undocumented alien fine for the number of persons intended to be brought back at the time of departure, and not on the basis of the actual number of aliens brought back. In other words, boat owners or captains would not be assessed fines for the number of persons landed in excess of those originally intended, thus establishing a procedure to excuse bringing back those aliens who may have been forced on board the vessel by the Cuban authorities. This guideline was applied regardless of whether the specific individuals intended to be transported were among those on board the vessel upon re-entry into the United States. No such distinction was made with respect to individuals who departed for Cuba after May 1, and as to such persons the fine was imposed on the basis of the total number of aliens brought to the United States.

The record presently available to the Court does not indicate the date either Defendant departed for Cuba. In *Sanchez*, the record indicates that the vessel arrived in Key West on September 12, 1980, while in *Armendaris*, the record indicates arrival on May 27, 1980. Thus, although the Court cannot determine definitively whether either Defendant would have been entitled to the special consideration provided by the guidelines, it appears likely that neither Defendant would have received that consideration. Moreover, if the Defendants failed to come within the guidelines specifically established to take account of duress and coercion, it is safe to assume that INS would not have responded favorably to an attempt to raise these defenses under the alternative theory of the "due diligence" defense. Thus, it may well be that it would have served no purpose to assert these defenses before the administrative tribunal, and, in the opinion of this Court, Defendants should be allowed the opportunity to do so at this time.

■ The Court is aware of *Lloyd Sabaudo Societa Anonima Per Azione v. Elting*, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341 (1932), which appears to hold that the Court should not receive evidence of defenses to the imposition of fines for bringing undocumented aliens into the United States which is not presented in the first instance to the administrative tribunal, but does not consider that case as controlling here. As noted earlier, these cases arose out of events unprecedented in the history of America. The confusing signals from Washington and the reported conduct of the Cuban authorities present a vastly different situation from that of a commercial passenger carrier making its established trans-oceanic voyages in the ordinary course of its business. Furthermore, these Defendants are not a sophisticated shipping line as in *Lloyd Sabaudo*, but rather are ordinary individuals, unfamiliar with the immigration laws and procedures. Counsel for both Defendants stated at oral argument that they were not even contacted by their clients with regard to this matter until after they were served with process in these cases. For all these reasons, the Defendant should now at least be afforded an opportunity to present a defense of duress or coercion or any other applicable defense directed at mitigation.

---

* These "guidelines" are strictly internal policy decisions of the INS rather than officially promulgated rules and regulations, and do not appear in the Code of Federal Regulations or Federal Register.

By this Order, the Court does not express any opinion on the Defendants' ability to establish a defense of duress and coercion or any other defense, but merely preserves their right to attempt to do so.

Accordingly, in view of the aforegoing, it is

ORDERED AND ADJUDGED that Plaintiff's Motions for Summary Judgment each be, and the same hereby are, DENIED.