CUNARD S. S. CO., Limited, v. ELTING, Collector of Customs of Port of New York.

No. 131.

Circuit Court of Appeals, Second Circuit.

Jan. 4, 1937.

Kirlin, Campbell, Hickox, Keating & McGrann and Gaspare M. Cusumano, all of New York City (Delbert M. Tibbetts, of New York City, of counsel), for plaintiff-appellant Cunard Steamship Company, Ltd.

Lamar Hardy, U. S. Atty., of New York City (George B. Schoonmaker, Asst. U. S. Atty., of New York City, of counsel), for defendant-appellee Philip Elting, Collector of Customs of the Port of New York.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The causes of action in the case at bar were all brought to recover steamship fines alleged to have been imposed upon the Cunard Steamship Company without warrant of law.

The aliens involved in causes of action Nos. 1, 2, and 3 were brought to the Port of New York and, on arrival, were found to be afflicted with loathsome or dangerous contagious diseases which two physicians of the United States Public Health Service certified might have been detected by competent medical examinations at the time of foreign embarkation.

The affliction of the alien in cause of action No. 1 was a gonococcus infection of the urethra—a venereal disease. The government physicians certified that it was not easily curable. The alien testified before the Board of Special Inquiry that a physician who had examined him prior to sailing had only looked at his hands and eyes, but the foreign physician certified that when examined the alien "showed no signs of gonococcus infection of the urethra." None of the details of the examination were set forth in the certificate.

The alien involved in cause of action No. 2 was afflicted with ringworm of the fingernail which the government physicians certified might have been detected by a competent medical examination at the foreign port and was not easily curable. She testified that the diseased condition had existed for two or three years before sailing. There was a certificate from a foreign physician that he had "carefully examined" her the day before she sailed and "found her showing no contagious disease or any abnormal condition preventing her from admission into the United States."

The alien in cause of action No. 3 also had ringworm of the fingernails. She testified that she had been examined in Finland before sailing and that the doctor there had told her that her condition "was nothing dangerous" and gave her no treatment. The government physicians certified that the disease was not easily curable and that the condition of the alien "might have been detected by competent medical examination at the port of embarkation." The Cunard Line in Liverpool sent a letter, which was made part of the record, saying that the alien had been subjected to rigorous examinations by physicians before sailing and that, if she had contracted ringworm of the nails, the disease would have been detected.

Each of the above three aliens was excluded by the Board of Special Inquiry, but, upon application to the Secretary of Labor, was allowed to land for hospital treatment, was cured, and thereafter admitted to the country as a quota immigrant. Notwithstanding the admission, fines were imposed upon the Cunard Line for bringing them to the United States.

It is not now contended that the diseases with which the three aliens were af--

flicted could not have been detected by a competent medical examination prior to embarking, but it is said that they were lawfully admitted into the United States and that such admission tolled the fines. The Department of Labor ruled that hospitalization and subsequent admission after cure did not exempt the aliens from the excluding provisions of the Immigration Act and held that, because their status became changed before they were permitted to land, the steamship line was not relieved from responsibility for fines. Such also was the conclusion of the trial court.

Section 3 of the Immigration Act of 1917, as amended (8 U.S.C.A. § 136), provides that "persons afflicted with tuberculosis in any form or with a loathsome or dangerous contagious disease" shall be "excluded from admission into the United States." It is not disputed that the diseases with which the aliens here were afflicted came within that category. Section 9 of the act, as amended (8 U.S.C.A. § 145), made it unlawful for persons to bring to the United States any alien so afflicted and provided that, if it should appear to the Secretary of Labor that the existence of such diseases might have been detected at the time of foreign embarkation by means of a competent medical examination, the transportation company bringing them to these shores should pay certain prescribed fines to the collector. Section 18, as amended (8 U.S.C.A. § 154), provides that:

"No alien certified, as provided in section sixteen of this act [section 152 of this title], to be suffering from tuberculosis in any form, or from a loathsome or dangerous contagious disease other than one of quarantinable nature, shall be permitted to land for medical treatment thereof in any hospital in the United States, unless the Secretary of Labor is satisfied that to refuse treatment would be inhumane or cause unusual hardship or suffering, in which case the alien shall be treated in the hospital under the supervision of the immigration officials at the expense of the vessel transporting him."

It is argued that the foregoing provision of section 18 for the admission of aliens (suffering from dangerous contagious diseases) in order to receive hopital treatment gives the Secretary of Labor the right to admit them permanently if cured and requires their deportation only when they are not cured. The plaintiff seeks to strengthen its argument by referring to the clause in section 18 which immediately follows the one we have quoted and provides for hospital treatment of aliens found to be insane, and directs the deportation of such aliens as soon as it is safe. But we cannot see that an express provision for the deportation of insane persons who have been admitted to hospitalization suggests an implied power to grant permanent admission to aliens afflicted with dangerous contagious diseases, when they are excluded by the express terms of section 3. That they cannot be admitted permanently , seems clear not only from the terms of section 3 but from the Regulations adopted for their temporary admission that were in force prior to the amendment of section 9 in 1924. Those Regulations provided that:

"The treatment of an alien under this rule shall not be construed to alter in any manner the status of the alien with reference to his right to enter or remain in the United States, nor to affect in any manner the liability of transportation companies under Section 9. * * *"

▮ The foregoing rule was continued in force after the amendment of section 9 in 1924 whereby the amount of fines to be imposed was increased. In the Regulations of 1930 it became paragraph 1 of subdivision G. The amendment of section 9 after the long-continued departmental interpretation of its scope was a legislative adoption of the administrative construction. Helvering v. Bliss, 293 U.S. 144, 151, 55 S.Ct. 17, 20, 79 L.Ed. 246, 97 A.L.R. 207; Robertson v. Downing, 127 U.S. 607, 612, 613, 8 S.Ct. 1328, 32 L.Ed. 269.

Nothing is said in section 18 about permanent admission and nothing in that section creates an exception to the excluding provisions of section 3 and the imposition of fines under section 9. Accordingly it seems clear that section 18 is directed to hardships resulting from a refusal to permit an alien to receive prompt medical treatment and not to hardships arising from ultimate deportation when he arrived with a "dangerous contagious disease."

▮ It follows from the above that the fines imposed in the cases of the three aliens were proper and cannot be recovered, because the admissions were unlawful. Lamport & Holt v. Elting, 74 F.(2d) 238, 240 (C.C.A.2).

Cause of action No. 11 involved an alien afflicted with trachoma, a dangerous contagious disease. She testified that she did not know before sailing that she had contracted it, but the government physicians found that she had the disease and certified that it might have been detected before embarkation by a competent medical examination. She was denied hospital treatment by the Secretary of Labor. A foreign physician testified that he had carefully examined her at Cherbourg, France, and "found her free from trachoma and without any sign of acute inflammation of eyelids." She was accordingly deported and the steamship line was fined. It is argued that the Secretary of Labor imposed the fine unfairly because he failed to observe the requirements prescribed by the Supreme Court in Lloyd Sabaudo Societa v. Elting, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341 (Appeal of Funco), by neglecting to submit the foreign certificate to the physicians at Ellis Island. It is said that if it had been submitted they might have changed their opinion that the existence of the disease might have been detected by a competent medical examination before leaving the port of embarkation.

The alien in cause of action No. 12 was a nonquota immigrant coming to the United States in February, 1930, from Jugo-Slavia to join her husband, who was a naturalized citizen residing in St. Louis. She testified before the Board of Special Inquiry that she had felt weak since July, 1929. The government physicians certified that the disease was not easily curable and might have been detected by competent medical examination at the port of embarkation. A foreign physician certified that he had thoroughly examined her at Cherbourg on January 28, 1930, and had found her "in a good condition and showing no sign of contagious disease, and especially tuberculosis." Another foreign physician certified that he had thoroughly examined her on January 25, 1930, and "found her to be perfectly physically and mentally healthy; she was not suffering from any illness, particularly not from tuberculosis of the lungs." She was ordered excluded, was deported on February 28, 1930, and the plaintiff was fined for bringing her into the country, though on arrival she had sought admission and had applied for hospital treatment under section 22 of the Immigration Act (8 U.S.C.

A. § 159). The line protested against the imposition of the fine on the ground that a competent medical examination of the alien was had before sailing which did not result in the discovery of tuberculosis, that the fine was imposed without resubmitting the case to the government physicians on the basis of the evidence of the foreign examinations, and also on the ground that the alien had the right to apply to the Secretary of Labor for hospital treatment and admission under section 22 of the Immigration Act of 1917 (8 U.S.C.A. § 159), but was prevented from doing so.

Section 22 provides that the wife and minor children of citizens or residents of the United States who have been found to be affected with "any contagious disorder" and have been sent for by the husband or father "shall be held, under such regulations as the Secretary of Labor shall prescribe, until it shall be determined whether the disorder will be easily curable or whether they can be permitted to land without danger to other persons; and they shall not be either admitted or deported until such facts have been ascertained; and if it shall be determined that the disorder is easily curable and the husband or father or other responsible person is willing to bear the expense of the treatment, they may be accorded treatment in hospital until cured and then be admitted, or if it shall be determined that they can be permitted to land without danger to other persons, they may, if otherwise admissible, thereupon be admitted."

The husband of the alien telegraphed to the Commissioner of Immigration that he would post a $1,000 Liberty bond against her becoming a public charge and would guarantee hospital expenses, but Immigration Rule 17 required a deposit with the Commissioner of sufficient cash to defray the cost of treatment for sixty days and the giving of a bond in the penal sum of not less than $500 or proof that the husband was unable to pay the expense of treatment. None of these conditions were met. The provisions of the ninth proviso of section 3 of the Immigration Act (8 U.S.C.A. § 136(q) permitting temporary admission likewise were not complied with because the alien had not prior to embarkation obtained the consent of the Secretary of Labor to be admitted temporarily, as required by paragraph 2 of subdivision B of rule 13 of the Immigration Rules of 1930.

The alien in cause of action No. 13 was a stone mason having a quota visa. He came from the Island of Cyprus, was thirty-five years of age, and was afflicted with arteriosclerosis which might affect his ability to earn a living. The government physicians certified that this condition "might have been detected by competent medical examination at the foreign port of embarkation." A foreign physician certified that he had thoroughly examined the alien at Cherbourg before sailing and that he "was in good condition and showed no sign of arteriosclerosis; no hardening of the arteries, no increase of blood pressure." He was ordered excluded, was later deported, and the steamship line was fined for bringing him into the country.

We think that the rule in Fusco's appeal (Lloyd Sabaudo Societa v. Elting, 287 U.S. 329, 53 S.Ct. 167, 77 L.Ed. 341) does not apply to any of the three aliens involved in causes of action Nos. 11, 12, and 13. None of the certificates of the foreign physicians showed the character of the examinations to which the aliens were subjected. Each certificate set forth little more than the conclusion of the examiner and could have no weight beyond what the personal reputation of the physician making the certificate afforded. It is easy enough to give enlightening information in such certificates to show just how the examinations were conducted, what tests were applied to detect disease, and, in short, to furnish the basis upon which the certificates rest. Nothing less can be any guide to the government physicians at the port of landing in reaching their conclusions and nothing less, we think, was enough to require a resubmission under the doctrine of the Fusco case. Compagnie Generale Transatlantique v. Elting, 73 F.(2d) 321 (C.C.A.2); Navigazione Italiana v. Elting, 77 F.(2d) 270, 273, (C.C.A.2).

The failure to observe the immigration rules when making application for hospital treatment under section 22 renders that section inapplicable to cause of action No. 12. In the same way the neglect before embarkation to obtain the consent of the Secretary of Labor to temporary admission as provided by paragraph 2, subdivision B, rule 13 (supra) of the Immigration Rules of January 1, 1930, precluded the right of the alien in cause of action No. 12 to apply for temporary admission under proviso 9 of section 3 of the Immigration Act (8 U.S.C.A. § 136(q).

The judgment is affirmed.